**CONTRACT COURIER SERVICES, INC., Plaintiff–Appellant— Cross–Appellee,**

**v.**

**RESEARCH AND SPECIAL PROGRAMS ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, Defendant–Appellee—Cross–Appellant.**

**Nos. 90–1349, 90–1384.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1990.

Decided Feb. 5, 1991.

Allan C. Zuckerman, Chicago, Ill., Neill T. Riddell, John W. Byrant, Eames, Wilcox, Mastej & Bryant, Detroit, Mich., for plaintiff-appellant—cross-appellee.

William Kanter, Mary K. Doyle, Dept. of Justice, Crim. Div., Washington, D.C., for defendant-appellee—cross-appellant.

Before EASTERBROOK, MANION, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Department of Transportation believes that "knowingly" in a penal statute includes "should have known", 49 C.F.R. § 107.299, and fined Contract Courier Services $18,000 because an independent contractor put too many cartons containing radioactive materials in one storage facility, and drivers put boxes containing radioactive materials too close to the cabs of the trucks. There is some dispute about whether the persons who placed the boxes in the forbidden positions were independent contractors as opposed to Contract Courier's employees, but the Department did not discuss the question, so we must assume that an answer would be favorable to Contract Courier. Although the statute, 49 U.S.C.App. § 1809(a)(1), allows the Department to impose civil penalties only when a carrier "knowingly" violates federal regulations, and although on the assumption we must indulge no employee of Contract Courier knew anything about any of these violations, the Department concluded that it should have known—perhaps by sending an employee to monitor the storage and loading of boxes. The district court enforced the decision but refused to add interest and nonpayment penalties. 1989 WL 118246 1989 U.S. Dist. Lexis 11289 (N.D. Ill.). Contract Courier maintains that failure to discover violations is not a form of knowledge under § 1809(a)(1). Because we agree, we shall not discuss the computation of the penalty or the Department's cross appeal.

Section 107.299, which equates knowledge with what the carrier should have known, was proposed in 1981 and justified not by a discussion of the text or history or objectives of the statute but instead by citation to *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). See 46 Fed.Reg. 47091, 47092 (Sept. 24, 1981). Commentators pointed out that *International Minerals* had nothing to do with § 1809(a)(1), to which the Department replied, when adopting the regulation:

> Notwithstanding those comments opposed to the definition, MTB [the Materials Transportation Bureau of the Department's Research and Special Programs Administration] believes that it is appropriate to include a definition of this critical concept in the enforcement procedures. However, MTB recognizes that modification of the proposed definition is necessary. Accordingly, these amendments to Part 107 adopt a definition of these key terms which is simpler than that proposed while still addressing a point raised in the vast majority of enforcement proceedings held to date, i.e., the respondent's inadvertency and lack of intent to violate the regulations.

48 Fed.Reg. 2646 (Jan. 20, 1983). This is no answer at all. It fails to give a reason why "should have known" is the *right* standard, or even a permissible one, under § 1809(a)(1). *International Minerals* addressed the question whether a statute, 18 U.S.C. § 834(f), making it a crime to violate a regulation "knowingly", requires the prosecutor to establish that the defendant knew of *the regulation*, as opposed to the facts constituting the violation. The Court held that knowledge of the law is not an element of the crime. Here the question is whether the Department of Transportation may dispense with knowledge of the facts, a step *International Minerals* declined to take. 402 U.S. at 563–65, 91 S.Ct. at 1700–02.

"Knew" and "did not know but should have known" are different. One

refers to actual and the other to imputed knowledge—which is to say *no* knowledge, accompanied by circumstances that lead the legal system to treat ignorance the same way it treats knowledge. Statutory words mean nothing unless they distinguish one situation from another; line-drawing is the business of language. So "knowledge" or "knowingly" separates the mental state essential to liability from a different mental state that does not support liability. See, e.g., *Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991); *United States v. Giovannetti*, 919 F.2d 1223, 1228–29 (7th Cir. 1990); *Radiology Center, S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1222–23 (7th Cir.1990). Section 107.299 obliterates any distinction between knowledge and ignorance. Its application in this case produced strict liability: the Department's two adjudicatory officers did not explain why Contract Courier "should have known" about the placement of the boxes or suggest that failure to acquire this knowledge was negligent. They went straight from the existence of a violation to liability. The statute does not permit this equation.

Sometimes the law requires inquiry and treats a person as possessing whatever knowledge inquiry would have produced. This puts teeth into the requirement of inquiry. See *United States v. Ross*, 917 F.2d 997, 999–1001 (7th Cir.1990); *Shacket v. Philko Aviation, Inc.*, 841 F.2d 166 (7th Cir.1988) (distinguishing between "constructive notice" and "implied actual notice"). The Department's explanation when proposing § 107.299 suggests that it had something of the sort in mind. It wrote: "Actual knowledge that a given act is a violation of a particular requirement is not required, and the concept includes, with respect to the facts which establish a violation, what the person *should have known* in the proper exercise of its responsibilities." 46 Fed.Reg. at 47092 (emphasis in original). This equation works, however, only if some rule of law penalizes failure to make inquiry. It is not an interpretation of "knowingly". Nothing in the Department's voluminous rules—at least nothing the Department has called to our atten-

tion—requires a carrier to monitor the work of its independent contractors. Perhaps the selection of a contractor known to be careless or poorly trained could support liability, cf. *Canton, Ohio v. Harris*, 489 U.S. 378, 387–92, 109 S.Ct. 1197, 1203–06, 103 L.Ed.2d 412 (1989), but the Department does not contend that Contract Courier selected incompetent contractors. There is another form of knowledge: going out of one's way to avoid news for fear that it would confirm one's suspicions. E.g., *United States v. Ramsey*, 785 F.2d 184, 188–91 (7th Cir.1986). We need not pursue this possibility, however, because the Department did not find that Contract Courier suspected anything.

Because it is wise on occasion to require persons to acquire knowledge, and to treat them as if they have done so, statutes frequently provide that a person "knows" whatever a reasonable inquiry would have turned up. E.g., 15 U.S.C. § 2069(d), 15 U.S.C. § 3414(b)(6)(B), 42 U.S.C. § 6303(b). But § 1809(a)(1) is not such a statute, and it makes sense to give different meanings to different statutory formulae. At least, § 1809(a)(1) was not such a statute until recently. Section 12 of the Hazardous Materials Transportation Uniform Safety Act of 1990, Pub.L. 101–615, 104 Stat. 3244, which the President signed on November 16, 1990, after the oral argument of this case, adds a new § 1809(a)(3), which provides that a person acts knowingly if he has actual knowledge or if "a reasonable person acting in the circumstances and exercising due care would have such knowledge." The Department does not contend that this amendment applies retroactively, and it would not save the penalty even if it applies. The Department's adjudicatory officers did not find that Contract Courier would have acquired the necessary knowledge by "exercising due care" in the circumstances.

The genesis of § 1809(a)(1) demonstrates that the amendment changes the law as opposed to clarifying its original meaning. *United States v. Allied Chemical Corp.*, 431 F.Supp. 361 (W.D.N.Y.1977), assembles this history. See also 1974 U.S.Code Cong.

& Admin.News 7669–7701. Congress enacted the law in 1974. The House bill, H.R. 15223, created a system of strict liability. The Senate bill, S. 4057, authorized strict liability for corporations but created liability for employees only if they acted with knowledge, and it creates criminal sanctions for "knowing" violations. The Conference Committee spurned both options and rewrote the legislation. It authorized civil penalties only for "knowing" violations, and criminal sanctions for "willful" ones; it also raised the maximum penalties. So although the bills that went into the conference allowed civil liability on a "should have known" approach, the law that came out raised the necessary level of scienter. Section 107.299 effectively reinstates the original bills, but we must enforce what Congress enacted by bicameral action: the Conference substitute.

Against this the Department contends that the law is a remedial statute, to be construed liberally. This is a useless maxim—useless not only because it invites the equal and opposite riposte that penal statutes are to be strictly construed but also because it does not answer the question "how far?". Statutes do more than point in a direction, such as "more safety". They achieve a particular amount of that objective, at a particular cost in other interests. An agency cannot treat a statute as authorizing an indefinite march in a single direction. "[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (emphasis in original); *Pension Benefit Guaranty Corp. v. LTV Corp.*, —— U.S. ——, 110 S.Ct. 2668, 2676, 110 L.Ed.2d 579 (1990). See also *Board of Governors v. Dimension Financial Corp.*, 474 U.S. 361, 374, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986); *Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496, 503 (7th Cir.1989); *Mercado v. Calumet Federal Savings & Loan Ass'n*, 763 F.2d 269 (7th Cir.1985); *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310–11 (7th Cir. 1986); *In re Erickson*, 815 F.2d 1090, 1094 (7th Cir.1987).

■ All that remains is a claim that we should defer to the agency's interpretation of § 1809(a)(1). Deference depends on ambiguity, step one of the formula in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See also Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511. Section 1809(a)(1) is not ambiguous. And there are deeper problems with the agency's claim of authority.

■ "Deference" in administrative law comprises three situations. First is the possibility that the agency operates in a field not governed by law—that Congress did not establish rules of decision, and that the courts have not been authorized to do so either. Then government acts by rules of thumb rather than rules of law. Prosecutorial discretion and its administrative cousin, the failure to begin an investigation, come under this heading. See *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). *Whether* there is "law to apply" is a legal question on which the courts have the last word. Section 1809(a)(1) creates law. Second, and closely related, is the possibility that Congress delegated to the agency the task of creating rules of law. Both the statute delegating power and the rules created in the exercise of that power create legal issues requiring judicial interpretation. Actions taken under the delegation, however, are policy rather than legal choices, and Congress gave the discretion over these questions to the agency rather than the judges. Most of the deference cases before and after *Chevron* involve delegation. Courts exercise a traditionally judicial function in marking the bounds of the delegated power but decline to disturb choices made by the holders of that power. See

Robert A. Anthony, *Which Agency Interpretations Should Bind Citizens and the Courts?*, 7 Yale J. on Reg. 1 (1990) (collecting and discussing both cases and commentary). See also, e.g., *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408, 411–13 (7th Cir.1987); *Chicago Mercantile Exchange v. SEC*, 883 F.2d 537, 547–48 (7th Cir.1989). The Department does not contend that Congress delegated to it the task of altering or fleshing out the word "knowingly" in § 1809(a)(1).

█ Third comes the possibility of accepting an agency's answers whenever a law in its charge is ambiguous, even if Congress has not delegated to the agency the task of making policy. Judges hesitate to disturb agency interpretations not because what the agency says, goes, but because of the benefits of the division of labor. Agencies must translate law from the books to the world, make a system of paper rules work. Courts learn from this process. Judges recognize the wisdom in decisions of other circuits and the accumulated stock of precedents even though these are not "binding". So too with the views of agencies, especially once we recognize that stable, uniform implementation may be more important than getting the rule "right". The Secretary of Blivets can produce a uniform national rule; review by more than 650 district judges and 179 appellate judges tugs against stability and uniformity. (The Supreme Court can restore uniformity in a few instances but examines only a tiny fraction of the administrative decisions that come before the inferior courts.) Add that there *is* no "right" interpretation of an ambiguous enactment, that there are only ranges of permissible interpretations, and the utility of allowing the agency to select from within the range becomes doubly apparent. Modesty about the abilities of a diffuse body unacquainted with the practicalities of administration leads judges to leave well enough alone. "Don't speak to me of reform, things are bad enough as they are!" is a good working motto for judicial review. Once more, however, this understanding of the nature of deference to administrative interpretations does not assist the Department. Section 1809(a)(1) is not part of an operational program, and the Department's view did not grow out of its experience in carrying out the tasks Congress gave it. Instead the interpretation came from a misunderstanding of *International Minerals*—at least so far as any explanation was vouchsafed us in the Federal Register. We conclude, then, that the Department's say-so does not carry the day.

█ The judgment is reversed, and the case is remanded to the district court so that it may remand the case to the Department of Transportation. Evidence in the record is sufficient to support a penalty, if the persons who placed the cartons were Contract Courier's employees, a question the Department should address in the first instance. If it concludes that these persons were employees, or that there is some other basis of liability, it should articulate the basis of the particular penalty it selects in light of the criteria listed in 49 U.S.C. App. § 1809. It need not, however, consider the criteria in the Sentencing Guidelines, which despite Contract Courier's arguments have no bearing on administrative fines.